UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

WAGNER EQUIPMENT CO.,

    Plaintiff,

v.

                                                                          Civ. No. 11-466 MV/GBW

JASON WOOD, individually
and dba PAMF Excavation and Logging,
and PAMF Excavation, LLC,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Summary Judgment [Doc. 101]. The Court, having considered the motion, briefs, relevant law, and being otherwise fully informed, finds that the Motion is well-taken and will be granted.

## BACKGROUND

Defendant PAMF Excavation, LLC ("PAMF") is a Washington limited liability company in the business of harvesting trees. Doc. 102 at 3. Its managing member is Defendant Jason Wood ("Wood"). *Id.* In October 2010 and January 2011, Defendants entered into contracts with a New Mexico lumber mill company, Western Wood Products, Inc. ("WWP"), pursuant to which Defendants agreed to harvest wood in New Mexico for WWP's mill. *Id.* In order to purchase the equipment necessary to perform their contract with WWP, Defendants contacted Plaintiff Wagner Equipment Company ("Wagner"). *Id.* Based on Defendants' stated needs, Nick Montoya, an employee of Wagner, located a used Caterpillar Model 501 Harvester ("Harvester") in South Carolina. *Id.* at 3-4.

Wagner obtained a copy of a condition report about the Harvester, and sent it to Wood. *Id.* at 4. With its moving brief, Plaintiff submitted to the Court a copy of a condition report, and indicated that this report was "substantially identical" to the one provided to Wood prior to Defendants' purchase of the Harvester. *Id.* at 4. Although Defendants admit that Plaintiff sent Wood a condition report about the Harvester, Defendants deny that the report submitted by Plaintiff is the report that was sent to Defendants. Doc. 120 at 3. Defendants did not submit to the Court the condition report that they claim to have received.

On October 19, 2010, PAMF purchased the Harvester from Wagner, pursuant to a Sales Contract Security Agreement and Financing Statement ("Sales Contract"). Doc. 102-5. Wood executed the contract for PAMF. Doc. 102 at 4. Defendants did not inspect the Harvester prior to the purchase. *Id.* On the first page of the Sales Contract, there is a box checked next to the words, "NO WARRANTY EXPRESS OR IMPLIED, 'AS IS, WHERE IS.'" Doc. 102-5 at 7. The second page of the Sales Contract similarly provides:

> USED GOODS WHETHER OR NOT SUBJECT TO MANUFACTURER'S WARRANTY, UNLESS A SEPARATE WRITTEN INSTRUMENT SHOWING THE TERMS OF ANY WARRANTY OR SERVICE CONTRACT IS FURNISHED BY SELLER TO BUYER, USED GOODS ARE SOLD "AS IS" WITH NO EXPRESS WARRANTY OR GUARANTEE, SELLER HEREBY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

*Id.* at 8.

Once the Harvester was delivered, Defendants detected problems with it. *Id.* at 5. Specifically, Defendants were unhappy with its output, and felt that it was not in the condition that had been represented to them. *Id.* After communications in which Wood expressed his dissatisfaction with Wagner, and Wagner's lack of success in addressing Wood's concerns, Wood,

individually and on behalf of PAMF, entered into a Settlement Agreement and Release ("Settlement Agreement"), effective as of March 9, 2011, with Wagner, Cat Financial Services, Inc., and Cat Inc.   Doc. 120-5.

The Settlement Agreement recites that:   PAMF experienced problems with the operation of the Harvester, which it contends caused PAMF to suffer certain economic damages; PAMF made certain demands on Wagner for the alleged damages ("PAMF Demands"); and PAMF presented to Wagner for payment a demand that PAMF had received from WWP ("WWP Demand").  *Id.* at 1.  Further, the Settlement Agreement recites that the parties had various discussions and negotiations regarding resolution of the issues surrounding the Harvester and the demands made by PAMF on Wagner, and "have agreed upon terms and conditions of settlement of all such issues."  *Id.*   Pursuant to the Settlement Agreement, Wagner noted its previous payments of certain sums and completion of certain repairs, and agreed to make payments of $8,122.71 to certain of PAMF's creditors, and a payment of $3,400 to PAMF.  *Id.* at 2.   In addition, Wagner agreed to "make its best efforts to address those issues described in the attached Exhibit D, to the reasonable satisfaction of PAMF."  *Id.*   In consideration of Wagner's promises to pay these sums and make these repairs, PAMF and "all of its owners, officers, members, directors, employees, agents, successors, assigns, and anyone claiming by, under or through them" agreed to "voluntarily and knowingly release, acquit and forever discharge each of Wagner, CAT and CAT Financial and all of their respective officers, shareholders, directors, employees, agents, successors and assigns, fully and completely from all claims, demands, actions, causes of action, damages, remedies, costs, attorneys' fees and expenses that PAMF and anyone claiming by, under or through them ever had, now has or may in the future have which arise out of "(i) the Harvester; (ii) the PAMF Demands; or (iii) the WWP Demand."  *Id.* at 2-3.

Thereafter, Wagner made the two payments to which it had agreed in the Settlement Agreement. To date, Defendants have not returned either of those payments. Doc. 120 at 11.

Wagner also performed certain repairs on the Harvester. Doc. 102 at 8. On April 6, 2011, Wood sent an email message to Wagner stating that "[d]ue to the unsatisfactory condition" of the Harvester as it had been returned to Defendants from Wagner after work was performed, "financial harm" was being caused to PAMF "that nullifies the settlement agreement." Doc. 102-1 at 12. Wood further wrote that the Harvester would "not be put into operation [until] all problems are fixed to satisfaction of a PAMF [] representative." *Id.* Wood subsequently refused to allow Wagner to retrieve the Harvester to take it to its shop for repairs, or to come to Defendants' job site to repair the Harvester. *Id.* at 9.

On April 22, 2011, Wood sent an email message to Wagner, stating: "Check your market share in king county wa for last month[;] you lost 12 pieces to john deer[e] thanks to me[;] this month is going to be ev[e]n worse. nc machine might be calling soon[;] I took it into my hands to tell them why." Doc. 102-10. Later that same day, Wood forwarded to Wagner an email message, noting in the re: line: "Just the start long weekend ahead." Doc. 49-1 at 4. The forwarded email message had been sent to news@kob.com, and stated:

> My name [is] Jason [W]ood and I own a logging company in [C]imarron [N]ew Mexico and Wagner cat . . . equipment dealer has caused me to lose a 4 million dollar contract and going to have to file for bankruptc[y.] I have all evidence documented how they caused it and was wondering if you would do a story on it to prevent other contractors from going through same nightmare.

*Id.*

Two days later, on April 24, 2011, Wood sent an email to several recipients, including Wagner, describing in negative terms his experience with Wagner and Caterpillar. At the conclusion of the email message, Wood wrote:

4

> The whole reason for this email to let Cat dealers know that I sent over 115 emails Saturday morning to news stations, newspapers, equipment magazines and other sources that cater to equipment buyers. This in turn will open buyers' eyes and prevent them from buying Cat products. So far 27 emails have come back from people wanting to publish my story. I have everything documented from day one. Also, I am going to send out multiple letters to other contractors telling my story to hopefully prevent them from buying Cat.

*Id.* at 5-6.

Thereafter, on May 10, 2011, Wood sent another email message to Wagner "to show how the big equipment giant Caterpillar treats their customers." In the message, Wood wrote that he wanted to explain "the whole story" to "a bunch of people to once again show how Cat and Wagner priorities are to drive customer[]s bankrupt." Doc. 49-1 at 7-9. In a May 12, 2011 email message, Wood wrote to Wagner that he had "a big crowd waiting to see what big caterpillar is going to do," and noted that a "big rancher . . . by the name Ted Turner" and "2 worldwide news stations" were interested in his story. *Id.* at 11.

In a conversation with WWP on April 25, 2011, Wagner learned that, although WWP had threatened to cancel its contract with Defendants, it had not done so. *Id.* at 12. During that conversation, WWP described the last few weeks of Defendants' production as "phenomenal." *Id.* WWP confirmed the following day that it had not cancelled the contract with Wood or PAMF. *Id.* at 14. Defendants admit that Wood "made up certain details" in his first April 22, 2011 email, and that he did this to "mess with" Plaintiff. Doc. 120 at 11.

Based on what Plaintiff described as "an email campaign to slander Plaintiff's name in the business community", Doc. 1-2, ¶ 15, on May 10, 2011, Plaintiff filed the instant action against Defendants in New Mexico state court. On June 1, 2011, Defendants removed the case to this Court under federal diversity jurisdiction. Doc. 1. In its Complaint for Injunctive Relief, Business Defamation and Breach of Contract, Plaintiff alleged a claim of business defamation and

5

a claim of breach of contract. Doc. 1-2.

On June 8, 2011, Defendants filed a Counterclaim, alleging breach of contract (Count I), breach of duty of good faith and fair dealing (Count II), breach of express warranty (Count III), breach of implied warranty of merchantability (Count IV), breach of implied warranty of fitness for a particular purpose (Count V), and malicious abuse of process (Count VI). Doc. 8. On April 5, 2012, Plaintiff filed the instant Motion for Summary Judgment, seeking dismissal of the Counterclaim in its entirety. Doc. 101. Defendants filed a response in opposition on May 21, 2012, Doc. 120, and Plaintiff's reply followed on July 11, 2012. Doc. 140.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912

F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).   The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."   *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.   *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## **DISCUSSION**

Plaintiff moves for summary judgment on several grounds.   First, Plaintiff argues that Defendants' Counterclaim must be dismissed in its entirety because PAMF is not registered with the New Mexico Public Regulation Commission ("PRC"), and thus may not maintain an action in any court in the state of New Mexico.   Further, Plaintiff argues that all counts, other than the malicious abuse of process count, are barred by the Settlement Agreement.   With regard to the three counts alleging breach of various warranties, Plaintiff makes the additional argument that the undisputed evidence demonstrates that Defendants expressly accepted the Harvester without any such warranties.   Finally, Plaintiff argues that no admissible evidence exists to satisfy the elements of Defendants' malicious abuse of process claim.

I.     PRC Registration

In its moving brief, Plaintiff argues that, because PAMF never registered with the PRC, it may not maintain an action in any court in New Mexico, including this Court.   In response, Defendants concede that, at the time they filed their Counterclaim, PAMF had not sought or obtained registration with the PRC.   Defendants, however, argue that PAMF's subsequent registration with the PRC allows them to maintain their Counterclaim.   In its reply brief, Plaintiff does not address Defendants' response, or provide any further argument in support of its motion for summary judgment on the basis of PAMF's lack of registration in New Mexico.

On May 23, 2012, a Certificate of Registration was issued to PAMF by the PRC, pursuant to the New Mexico Limited Liability Act, NMSA 1978 § 53-19-1 *et seq.*   Doc. 122-1.   As PAMF thus is now properly registered in New Mexico, their previous unregistered status is not a bar to the maintenance of their Counterclaim.   *See Applied Tech. Assocs., Inc. v. Schmidt*, 362 F. Supp. 1103, 1105-06 (D.N.M. 1973).

II.    Effect of the Settlement Agreement

Plaintiff argues that because all of Defendants' claims, save the abuse of process claim, fall within the scope of the claims resolved and released pursuant to the Settlement Agreement, Defendants are foreclosed from litigating those claims.   Defendants disagree, arguing that Wagner's failure to repair the Harvester's defects as required by the Settlement Agreement was a "material breach" of the Settlement Agreement, which excuses Defendants' obligations under that Agreement, including their release of Wagner.   Essentially, Defendants contend that, although they have no intention of rescinding the Settlement Agreement, or returning the partial consideration received from Plaintiff pursuant to that Agreement, they nonetheless may bring claims addressed, resolved, and released in the Settlement Agreement, because Plaintiff materially

breached that Agreement.   The Court agrees with Plaintiff that Defendants' position misunderstands the relevant law.

"New Mexico adheres to the election of remedies doctrine."   *Branch v. Chamisa Devel. Corp., Ltd.*, 223 P.3d 942, 947 (N.M. Ct. App.), *cert. denied*, 225 P.3d 793 (N.M. 2009).   Under this doctrine, a non-breaching party to a settlement agreement "can elect either to return to the parties' preexisting obligations or to enforce the Agreement."   *Guddee v. Abudanza, Inc.*, No. 06-664, 2007 WL 4354420, *8 (D. Haw. Dec. 12, 2007).   The first option – returning to the parties' obligations prior to the settlement agreement – is known as "rescission."   *Black's Law Dictionary* defines "rescission" as "[a] party's unilateral unmaking of a contract for a legally sufficient reason, *such as the other party's material breach*][.]"   Black's Law Dictionary 1420-21 (9th ed. 2009) (emphasis added).   *Black's Law Dictionary* further explains that "[r]escission is generally available as a remedy or defense for a nondefaulting party and is accompanied by restitution of any partial performance, thus restoring the parties to their precontractual positions."   *Id.*

New Mexico law is clear that "a party seeking to rescind a contract . . . after receiving valuable consideration must tender back that consideration before rescission will be permitted; to retain the consideration would be inconsistent with the remedy sought."   *Branch*, 223 P.3d at 947.   Accordingly, if a party does not tender back the consideration received pursuant to a settlement agreement, any "attempted repudiation of the Settlement Agreement is ineffective and the Settlement Agreement is, therefore, binding upon [it]."   *Id.* at 949.   It follows that, "because the Settlement Agreement remains in force," a party cannot litigate claims "specifically encompassed" by the Settlement Agreement.   *Id.*

Here, Defendants do not dispute that their claims for breach of contract, breach of the duty

9

of good faith and fair dealing, and breach of various warranties were all "specifically encompassed" by the Settlement Agreement. Nor do they dispute that the Settlement Agreement remains in force. In fact, they specifically assert that they are not seeking rescission of the Settlement Agreement.

Nonetheless, Defendants argue that Plaintiff's material breach of the Settlement Agreement allows them to pursue their underlying claims, and that neither the concept of rescission nor the doctrine of election of remedies applies here. In support of this argument, Defendants cite to *Famiglietta v. Ivie-Miller Enter., Inc.*, 966 P.2d 777 (N.M. Ct. App. 1998), for the proposition that, under New Mexico law, if a party to a contract commits an uncured material breach, the other party is not required to perform its remaining obligations under the contract. In *Famiglietta*, however, the Court discussed the effects of material breach in the context of a claim for rescission. The Court specifically noted that the buyer, who argued that it should not be held liable for the outstanding balance due under a contract because the seller had failed to fulfill his obligation under that contract, "[i]n essence, [was arguing] that because of [the seller's] conduct it should be entitled to rescind the contract." *Id.* at 781. Further, the Court noted that the buyer had attempted to return the consideration it had received under the parties' contract, but that the seller refused to accept it. *Id.* at 783. Indeed, the Court's entire discussion of material breach is contained in a section of the decision entitled, "Buyer's Right to Rescind the Contract." *Id.* The *Famiglietta* Court thus followed the law, described above, that allows a non-breaching party to elect to rescind a contract where the other party has committed a material breach. Nowhere in *Famiglietta* does the Court suggest, as Defendants do here, that a party who elects not to rescind a contract is entitled to release of its contractual obligations.

Defendants have provided no authority to support their position that they may retain the

10

partial consideration received from Plaintiff pursuant to the Settlement Agreement, yet continue to pursue the very claims against Plaintiff that they released in the Settlement Agreement. As Defendants have clearly stated their intention not to rescind the Settlement Agreement, their only available remedy is to enforce the Settlement Agreement. Defendants are bound by their obligations under the Settlement Agreement, including their release of claims that are encompassed by the Settlement Agreement. Because the claims set forth in Counts I through V of their Counterclaim are undisputedly encompassed by the Settlement Agreement, Defendants are foreclosed from litigating those claims. Summary judgment thus should be granted in Plaintiff's favor on Counts 1 through V of the Counterclaim.

### III.     Breach of Warranty Claims

In Counts III through V of the Counterclaim, Defendants allege that Plaintiff breached various warranties in connection with the sale of the Harvester. In addition to arguing that these claims are barred by the Settlement Agreement, Plaintiff further argues that these claims must be dismissed because the undisputed evidence demonstrates that Defendants in fact accepted the Harvester without any warranties at all. Specifically, Plaintiff points to the written disclaimer language in the Sales Contract, which indicated that there was "no warranty express or implied," and that the Harvester was being sold "as is." Doc. 102-5 at 7-8. Defendants, however, argue that their warranty claims fall within the stated exception to the disclaimer, namely, that a warranty could be created if "a separate written instrument showing the terms of any warranty or other service contract is furnished by seller to buyer." *Id.* at 8. According to Defendants, the condition report Plaintiff provided to Wood constitutes a "separate written instrument" that created an express warranty and rendered the warranty disclaimer in the Sales Contract ineffective.

Defendants, however, have specifically denied receipt of the condition report submitted by

Plaintiff, and have not provided any other version of the condition report to this Court for review. Accordingly, Defendants have neither pointed to, nor provided, any admissible evidence of a "separate written instrument" showing the terms of any warranty or other service contract provided by Plaintiff to Defendants. In the absence of any such evidence, the Court finds that, in the Sales Contract, Plaintiff effectively disclaimed any warranty on the Harvester. For this additional reason, summary judgment in favor of Plaintiff is warranted on Counts III through V of the Counterclaim.

### IV. Malicious Abuse of Process Claim

Plaintiff argues that no admissible evidence exists to satisfy the elements of Defendants' claim, set forth in Count V, of malicious abuse of process. Under New Mexico law, "in any malicious abuse of process claim, the use of any process for an illegitimate purpose forms the basis of the tort." *Lenscrafters, Inc. v. Kehoe, O.D.*, 282 P.3d 758, 765 (N.M. 2012) (citation omitted). "The purpose of the tort is to discourage the misuse of our judicial system." *Id.* "[B]ecause of the potential chilling effect on the right of access to the courts," the tort is disfavored. *Id.*

There are three elements of a malicious abuse of process claim: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Id.* at 766 (citation omitted). Misuse of process, the first element, can be shown in one of two ways: "(1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment." *Id.* (citation omitted).

To prove that a claim lacks probable cause, "a claimant must show that the opponent did not hold "a reasonable belief in the validity of the allegations of fact or law of the underlying claim." *Id.* (citation omitted). Such a "reasonable belief" must be "founded on known facts

established after a reasonable pre-filing investigation." *Fleetwood Retail Corp. of N.M. v. LeDoux*, 164 P.3d 31, 36 (N.M. 2007). The "lack of probable cause must be manifest," and the "court's analysis of probable cause should be undertaken in a manner that will likely have the least chilling effect on a litigant's access to the courts," so as not to "discourage the fundament right of access to the courts." *Lenscrafters*, 282 P.3d at 766 (citation omitted). Moreover, the fact that a claim is "ultimately dismissed by the district court has no bearing on the question of whether [there was] probable cause to file suit." *Guest v. Berardinelli*, 195 P.3d 353 (N.M. Ct. App.), *cert. denied*, 196 P.3d 488 (N.M. 2008); *see also Lenscrafters*, 282 P.3d at 766 ("[A] determination that summary judgment is appropriate [does not] equate[] to a lack of probable cause for seeking judicial relief."). *Id.*

Here, Defendants allege misuse of process on the basis that Plaintiff filed their Complaint without probable cause. Doc. 135 ¶¶ 61-62. To state lack of probable cause, Defendants further allege that Plaintiff had no "reasonable belief in the validity of its factual and legal allegations against [Defendants]." *Id.* According to Plaintiff, no admissible evidence exists to support these allegations, and to the contrary, both of its claims were based on probable cause. Defendants disagree, arguing that there remains a genuine dispute regarding whether Plaintiff failed to conduct a reasonable pre-filing investigation from which it could obtain facts to support a reasonable belief that a fact-finder could find in its favor on any of its claims.

With regard to Plaintiff's defamation claim, Defendants argue that Plaintiff's pre-filing investigation was insufficient to establish the element of damages, as Wagner failed to confirm whether the recipients of Wood's negative email messages believed Wood's criticism of Wagner. But Wood himself communicated to Plaintiff that Wagner had "lost 12 pieces to john deer[e] thanks to [him]" in the month of April, and that the next month was "going to be ev[e]n worse."

Doc. 102-10.   Wood also advised Wagner that, in response to more than 115 emails he sent to "news stations, newspapers, equipment magazines and other sources that cater to equipment buyers," he had "27 emails [] come back from people wanting to publish his story," and that a "big rancher . . . by the name Ted Turner" and "2 worldwide news stations" were interested in his story. Doc. 49-1 at 5-6, 11.   These email messages provided a sufficient basis for Plaintiff to have reasonably believed that the recipients of Wood's emails gave credence to his statements about Wagner, and thus that it would be able to establish the damages element of its defamation claim. Accordingly, based on the undisputed evidence, Defendants will be unable to show a "manifest" lack of probable cause for Plaintiff's defamation claim.

With regard to Plaintiff's breach of contract claim, Defendants argue that Plaintiff had no probable cause, as it based that claim solely on Wood's email message stating that Wagner's failure to satisfactorily repair the Harvester "nullifies the Settlement Agreement." According to Defendants, this allegation does not reasonably support a breach of contract claim.   In support of this argument, Defendants note that the Court dismissed Plaintiff's original breach of contract claim for failure to state a claim upon which relief can be granted.   As Defendants admit, however, the Court's ultimate dismissal of a claim has no bearing on the question of whether Plaintiff had probable cause to bring that claim.   Although Plaintiff did not sufficiently *plead* its original breach of contract claim, Wood's actions subsequent to the Settlement Agreement nonetheless were sufficient to create a reasonable belief that Defendants intended to repudiate their obligations under the Settlement Agreement.   Accordingly, based on the undisputed evidence, Defendants will be unable to show a "manifest" lack of probable cause for Plaintiff's breach of contract claim.

**CONCLUSION**

Although PAMF was not registered with the PRC at the time Defendants filed their Counterclaim, PAMF has been registered with the PRC since May 23, 2012. Accordingly, they are permitted to maintain their Counterclaim in this Court. Because Counts I through V of the Counterclaim set forth claims specifically encompassed by the Settlement Agreement, and because the Settlement Agreement remains in force, Defendants are foreclosed from litigating those claims. Because Plaintiff expressly disclaimed any warranties on the Harvester in the Sales Contract, and because Defendants have failed to present any admissible evidence of a separate written instrument showing the terms of any warranty, there is no basis for Defendants' breach of warranty claims. Finally, based on the undisputed evidence, Defendants cannot show a manifest lack of probable cause for Plaintiff's Complaint.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. 101] is granted.

DATED this 26th day of February, 2013.

_____
MARTHA VÁZQUEZ
United States District Judge