## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

WAGNER EQUIPMENT CO.,

   Plaintiff,

v.

             Civ. No. 11-466 MV/GBW

JASON WOOD, individually
and dba PAMF Excavation and Logging,
and PAMF Excavation, LLC,

   Defendants.

### MEMORANDUM OPINION AND ORDER

  **THIS MATTER** comes before the Court on Plaintiff's Motion for Partial Summary

Judgment [Doc. 165].   The Court, having considered the motion, briefs, relevant law, and being

otherwise fully informed, finds that the Motion is well-taken and will be granted.

### BACKGROUND

  Defendant PAMF Excavation, LLC ("PAMF") is a Washington limited liability company

in the business of harvesting trees.   Doc. 102 at 3.   Its managing member is Defendant Jason

Wood ("Wood").   *Id.*   In October 2010 and January 2011, Defendants entered into contracts with

a New Mexico lumber mill company, Western Wood Products, Inc. ("WWP"), pursuant to which

Defendants agreed to harvest wood in New Mexico for WWP's mill.   Doc. 176 at 12.   In order to

purchase the equipment necessary to perform their contract with WWP, Defendants contacted

Plaintiff Wagner Equipment Company ("Wagner").   *Id.* at 13.   Wagner told Defendants that its

"forestry salesman" would contact them.   Doc. 120-3 at ¶ 3.   Nick Montoya, an employee of

Wagner, then contacted Defendants about their equipment needs.   *Id.*   Ultimately, Montoya

located a used Caterpillar Model 501 Harvester ("Harvester") in South Carolina.   Doc. 176 at 12.

Wagner obtained a copy of a condition report about the Harvester, and sent it to Wood. Doc. 166 at 5.   With its moving brief, Plaintiff submitted to the Court a copy of the condition report which it contends was the condition report sent to Wood.   *Id.*   Although Defendants admit that Plaintiff sent Wood a condition report about the Harvester, Defendants deny that the report submitted by Plaintiff is the report that was sent to Defendants.   Doc. 176 at 4.

On October 19, 2010, PAMF purchased the Harvester pursuant to a Sales Contract Security Agreement and Financing Statement ("Sales Contract").   Doc. 102-5.   Wood executed the contract for PAMF.   Doc. 102 at 4.   Although Wagner was not a party to the contract, Wagner received a finder's fee for arranging the sale of the Harvester to Defendants.   Doc. 176 at 6.

After delivery, Defendants "soon realized that the Harvester had many [] problems," including "missing and damaged parts," and as a result, "was unusable."   Doc. 120-3 at ¶ 9.   On November 22, 2010, Wagner sent a mechanic, Edward Rogan, to inspect the Harvester.   Doc. 166 at 8.   When Rogan saw the Harvester, he said:   "What is that thing?"   *Id.*   Nonetheless, Rogan testified that he was confident that he would be able to successfully repair the Harvester.   *Id.*

At the time, Wagner was not an authorized dealer of Caterpillar forestry parts, and as a result, could not order parts for the Harvester head.   Doc. 166-10 at 23.   Wagner established an account, which enabled it to order the parts needed for the Harvester.   *Id.*   Rogan then ordered parts to fix the Harvester.   Doc. 166-10 at 83.   According to Plaintiff, while Wagner's mechanics did not have much experience with the forestry head on the Harvester, the engine in the Harvester is the same as that in an excavator, a machine with which Wagner's mechanics have substantial experience.   Doc. 166-11 at 61-62.

Wagner reached out to forestry representatives at Caterpillar for assistance with the Harvester.   Doc. 166-3 at 54-55.   On December 8, 2010, a group of Wagner and Caterpillar employees, including Wayne Ocker, a Service Technical Representative for Caterpillar's "cut-to-length" forestry equipment (which includes the Harvester), went to Defendants' worksite to address issues with the Harvester.   Doc. 166 at 9; Doc. 102-7 at ¶¶ 1-2.   According to Ocker, when he left the job site, the Harvester was operable, although in need of one part that was to be installed by Wagner.   Doc. 102-7 at ¶ 4.

Thereafter, Wagner continued to attempt to repair the Harvester so that it could be used. Doc. 120-3 at ¶ 11.   According to Wagner, the service technicians and journeymen assigned to make repairs to the Harvester "have decades of mechanic experience and are highly qualified Caterpillar technicians," and were capable of making the required repairs.   Doc. 166-13 at ¶ 3. Further, Wagner states that its mechanics "followed standard Caterpillar protocols and procedures and used their best efforts" to repair the Harvester.   *Id.* At ¶ 4.   Wagner believed that by January 3 2011, the Harvester was "fully repaired to the condition as sold."   Doc. 166-3 at 63.

Defendants, however, state that the Harvester was not in the condition represented by Wagner and repeatedly broke down.   Doc. 120-3 at ¶ 11.   Further, Defendants state that Wagner did not perform repairs "in a complete and proper manner," that Defendants "continued to experience problems with the Harvester as a result of the repairs not having been properly performed," and that Wagner "was unable to correctly perform the required repairs to the Harvester, and it therefore had to get help from CAT."   Doc. 176 at 11-12.

"After a series of Wagner's failures to correct the Harvester," Doc. 120-3 at ¶ 11, Wood, individually and on behalf of PAMF, entered into a Settlement Agreement and Release ("Settlement Agreement"), effective as of March 9, 2011, with Wagner, Cat Financial Services,

Inc., and Cat Inc.   Doc. 120-5.   The Settlement Agreement recites that:   PAMF experienced

problems with the operation of the Harvester, which it contends caused PAMF to suffer certain

economic damages; PAMF made certain demands on Wagner for the alleged damages ("PAMF

Demands"); and PAMF presented to Wagner for payment a demand that PAMF had received from

WWP ("WWP Demand").   *Id.* at 1.   Further, the Settlement Agreement recites that the parties

had various discussions and negotiations regarding resolution of the issues surrounding the

Harvester and the demands made by PAMF on Wagner, and "have agreed upon terms and

conditions of settlement of all such issues."   *Id.*   Pursuant to the Settlement Agreement, Wagner

noted its previous payments of certain sums and completion of certain repairs, and agreed to make

payments of $8,122.71 to certain of PAMF's creditors, and a payment of $3,400 to PAMF.   *Id.* at

2.   In addition, Wagner agreed to "make its best efforts to address those issues described in the

attached Exhibit D, to the reasonable satisfaction of PAMF."   *Id.*   In consideration of Wagner's

promises to pay these sums and make these repairs, PAMF and "all of its owners, officers,

members, directors, employees, agents, successors, assigns, and anyone claiming by, under or

through them" agreed to "voluntarily and knowingly release, acquit and forever discharge each of

Wagner, CAT and CAT Financial and all of their respective officers, shareholders, directors,

employees, agents, successors and assigns, fully and completely from all claims, demands,

actions, causes of action, damages, remedies, costs, attorneys' fees and expenses that PAMF and

anyone claiming by, under or through them ever had, now has or may in the future have which

arise out of "(i) the Harvester; (ii) the PAMF Demands; or (iii) the WWP Demand."   *Id.* at 2-3.

Thereafter, Wagner made the two payments to which it had agreed in the Settlement

Agreement.   To date, Defendants have not returned either of those payments.   Doc. 120 at 11.

4

On March 21, 2011, Wagner picked up the Harvester and brought it to Wagner's shop in Pueblo, Colorado, with the intent of making the repairs required under the Settlement Agreement. Doc. 166-3 at 173-74.   Wagner returned the Harvester to Defendants on April 5, 2011.   Doc. 166 at 11.   Issues with the Harvester had not been addressed to Defendant's reasonable satisfaction. Doc. 120-3 at ¶ 13.

On April 6, 2011, Wood sent an email message to Wagner stating that "[d]ue to the unsatisfactory condition" of the Harvester as it had been returned to Defendants from Wagner after work was performed, "financial harm" was being caused to PAMF "that nullifies the settlement agreement."   Doc. 102-1 at 12.   Wood further wrote that the Harvester would "not be put into operation [until] all problems are fixed to satisfaction of a PAMF [] representative."   *Id.*   Wood subsequently refused to allow Wagner to retrieve the Harvester to take it to its shop for repairs, or to come to Defendants' job site to repair the Harvester.   *Id.* at 9.   Because of the issues with the Harvester, Defendants could not deliver timber to WWP as required by their contract, and WWP canceled the contract.   Doc. 176 at 19.

On May 10, 2011, Plaintiff filed the instant action against Defendants in New Mexico state court.   On June 1, 2011, Defendants removed the case to this Court under federal diversity jurisdiction.   Doc. 1.   In its Complaint for Injunctive Relief, Business Defamation and Breach of Contract, Plaintiff alleged a claim of business defamation and a claim of breach of contract.   Doc. 1-2.

On June 8, 2011, Defendants filed its Counterclaim, alleging breach of contract (Count I), breach of duty of good faith and fair dealing (Count II), breach of express warranty (Count III), breach of implied warranty of merchantability (Count IV), breach of implied warranty of fitness for a particular purpose (Count V), and malicious abuse of process (Count VI).   Doc. 8.

Thereafter, on July 3, 2012, Defendants filed its First Amended Counterclaim, adding claims of negligent misrepresentation (Count VII), fraud (Count VIII), constructive fraud (Count IX), and violation of the New Mexico Unfair Practices Act (Count X).   Doc. 135.

On April 5, 2012, Plaintiff filed an opposed motion for summary judgment, seeking dismissal of the Counterclaim (Count I through V).   Doc. 101.   In a Memorandum Opinion and Order entered February 26, 2013, the Court granted the motion ("February 26, 2013 Opinion"). Doc. 183.

On October 30, 2012, Plaintiff filed the instant Motion for Partial Summary Judgment, seeking dismissal of the Counts VI through X of the First Amended Counterclaim.   Doc. 165. Defendants filed a response in opposition on January 7, 2013.   Doc. 176.   Plaintiff's reply followed on March 20, 2013.   Doc. 189.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.   *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).   The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."   *Celotex*

*v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party meets its initial burden, the

nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for

which it carries the burden of proof."   *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912

F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).   The nonmoving party cannot rely upon

conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v.*

*Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond

the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most

favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be

drawn from the evidence."   *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997),

*aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then

a court must next determine whether the movant is entitled to judgment in its favor as a matter of

law.   *See, e.g*., *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

Plaintiff moves for summary judgment on Defendants' claims of negligent

misrepresentation, fraud, constructive fraud, and violation of the New Mexico Unfair Practices

Act ("UPA"), set forth in Counts VII through X of the First Amended Counterclaim.   Defendants

predicate those claims on alleged misrepresentations made by Wagner before Defendants

purchased the Harvester, after the purchase but before the date of the Settlement Agreement, and

after the effective date of the Settlement Agreement.   In support of its motion, Plaintiff first

contends that, to the extent that Defendants' claims are based on misrepresentations allegedly

7

made prior to the effective date of the Settlement Agreement, those claims are barred by the

Settlement Agreement.   With regard to Defendants' claims based on misrepresentations made in

connection with and after the effective date of the Settlement Agreement, Plaintiff further

contends that Defendant is unable, based on the undisputed facts, to establish all of the elements

necessary to prove those claims.   Defendants, on the other hand, argue that each of their claims is

supported by at least one, and often several, communications identified by them as false or

misleading, and that because facts exist to support each of their claims, summary judgment is

improper.

I.      <u>Claims Based on Pre-Settlement Misrepresentations</u>

      Plaintiff argues, and Defendants do not deny, that Defendants' claims are based in part on

misrepresentations allegedly made before the effective date of the Settlement Agreement.

According to Plaintiff, to the extent that Defendants' claims are based on such pre-settlement

misrepresentations, they fall within the scope of the claims resolved and released pursuant to the

Settlement Agreement, and Defendants thus are foreclosed from litigating those claims.   As

Plaintiff notes, in its February 26, 2013 Opinion, this Court held that Defendants are bound by

their obligations under the Settlement Agreement, including their release of claims that are

encompassed by the Settlement Agreement.   Doc. 183 at 11.   Because Defendants' claims for

breach of contract, breach of duty of good faith and fair dealing, and breach of various warranties

undisputedly are encompassed by the Settlement Agreement, the Court determined that

Defendants are foreclosed from litigating those claims.   On that basis, the Court granted summary

judgment in Plaintiff's favor on Counts I through V of the Counterclaim.   *Id.*

      The Court's conclusion that Defendants are bound by their release of claims is equally

applicable here.   It appears undisputed that Defendants' claims of negligent misrepresentation,

fraud, constructive fraud, and violation of the UPA, to the extent those claims are based on

pre-settlement misrepresentations, are encompassed by the Settlement Agreement, in which

Defendants released all claims arising from the Harvester, the PAMF Demands, and the WWP

Demand.   Because Defendants agreed to release all claims encompassed by the Settlement

Agreement, Defendants are foreclosed from litigating their claims of negligent misrepresentation,

fraud, constructive fraud, and violation of the UPA, to the extent those claims are based on

pre-settlement misrepresentations.   Accordingly, the remainder of the Court's analysis will

address Defendants' claims only to the extent that they rely on representations made in connection

with or after the date of the Settlement Agreement.

II.    <u>Fraud Claims</u>

"Fraud consists of a misrepresentation of fact, known by the maker to be untrue, made with

the intent to deceive and to induce the other party to act on it, and on which the other party relies to

his detriment."   *Meiboom v. Carmody*, 82 P.3d 66, 69 (N.M. Ct. App. 2003).   "A failure to

disclose information can constitute a fraud."   *Id.*   Under the general rule, "fraud must relate to a

present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or

statements as to future events."   *Id.* (citation omitted).   An exception to the general rule exists,

however, "where the promise is based on a concealment of known facts."   *Id.* (citation omitted).

Accordingly, a promise or forward-looking statement may be actionable if the person making the

promise or statement "is guilty of an actual fraudulent intent, and makes the promise or

misrepresentation with the intention of deceiving and defrauding the other party."   *Id.* (citation

omitted).

Here, Defendants first base their fraud claims on Wagner's representations regarding its

intentions to fix the Harvester.   Specifically, Defendants argue that Wagner's promises to make

repairs to the Harvester, which promises were never fulfilled, constitute misrepresentations of fact, because Wagner knew or should have known, at the time it made the promises, that it was incapable of performing the necessary repairs to the Harvester.   Essentially, Defendants argue that Wagner's unfulfilled promises should be considered actionable because they were made with "an actual fraudulent intent."

As Plaintiff notes, however, Defendants have failed to present any evidence to establish that Wagner was incapable of performing the necessary repairs to the Harvester, or to refute the evidence submitted by Plaintiff that Wagner did, in fact, intend to repair the Harvester.   Wagner's evidence demonstrates that its mechanic, Rogan, was confident that he would be able to successfully repair the Harvester, and ordered parts to accomplish that task; the service technicians and journeymen assigned to make repairs to the Harvester had significant experience and were capable of making the required repairs; and Wagner's mechanics followed standard Caterpillar protocols and procedures and used their best efforts to repair the Harvester.   Doc. 166 at 8; Doc. 166-3 at ¶¶ 3-4.   Rather than provide contradictory evidence, Defendants argue that Plaintiff's evidence is "immaterial," and make the conclusory statements that "Wagner lacked the ability to properly perform the necessary repairs to the Harvester," and that Wagner's service technicians and journeymen did not use their best efforts to properly make repairs because, "[a]ssuming the necessary parts are available, any piece of equipment can be repaired if the mechanics invest sufficient time and resources into the repairs."   Doc. 176 at 7, 10, 12.

Defendants, however, provide no explanation for their characterization of Plaintiff's evidence as immaterial, and no factual basis for their own conclusions regarding Wagner's efforts and abilities.   As Plaintiff notes, Defendants appear to make the circular argument that because Wagner failed to perform the repairs, it must have been incapable of performing the repairs, and

10

thus must have been lying when it promised to make the repairs.   Such reasoning – that a party's ultimate inability to fulfill its promise alone demonstrates that its promise was made with fraudulent intent – would turn every breach of contract claim into a fraud claim.   Nor have Defendants established, simply by noting Wagner's *inexperience* with the Harvester, the separate and distinct fact of Wagner's *inability* to repair the Harvester and *knowledge of that inability* at the time it promised to make the repairs.

Accordingly, there is no evidence in the record that Wagner knew or should have known, at the time it promised to make repairs to the Harvester, that it was incapable of performing the necessary repairs to the Harvester.   Without such evidence of actual fraudulent intent, Wagner's promises are not actionable.

Next, Defendants base their fraud claims on Wagner's representations that it had completed the necessary repairs to the Harvester.   Specifically, Defendants argue that, although Wagner represented that it had fixed the Harvester in accordance with the terms of the Settlement Agreement, upon return of the Harvester on April 5, 2011, Defendants discovered that the issues with the Harvester in fact had not been resolved.   Plaintiff argues that, although there may be a dispute of fact as to whether Wagner falsely represented that it had completed repairs to the Harvester, those representations may not form the basis for Defendants' fraud claims, as the undisputed evidence demonstrates that Defendants did not rely to their detriment on those allegedly false representations.   The Court agrees with Plaintiff.

Defendant Wood himself stated in his affidavit that "[w]hen Wagner finally returned the Harvester to the Defendants on April, 5, 2011, issues with the Harvester had not been addressed to the Defendants' reasonable satisfaction."   Doc. 130-3 ¶ 13.   Similarly, he testified at his deposition that he observed that Wagner had over-tightened the tracks on the Harvester "before it

11

was even off the truck," and that after he "offloaded the machine" from Wagner's delivery truck, he "went back to call Wagner and ask them how they could send the machine out that way."   Doc. 189-1 at 2.   Further, just one day later, on April 6, 2011, Wood sent an email message to Wagner stating that "[d]ue to the unsatisfactory condition" of the Harvester as it had been returned to Defendants from Wagner after work was performed, "financial harm" was being caused to PAMF "that nullifies the settlement agreement," and that the Harvester would "not be put into operation [until] all problems are fixed to satisfaction of a PAMF [] representative."   Doc. 102-1 at 12. This evidence makes clear that Defendants recognized the falsity of Wagner's April 5, 2011 representations immediately.   Rather than rely to their detriment on those representations, Defendants explicitly stated their refusal to use the Harvester in reliance on Wagner's representations.   Any harm suffered by Defendants, in the form of expenses incurred to repair the Harvester, lost production time, transportation back to their place of business, or otherwise, thus could not have resulted from Defendants' reliance on Wagner's April 5, 2011 representations regarding the completion of repairs to the Harvester.   Accordingly, Defendants' fraud claims predicated on Wagner's statements regarding the completion of repairs lack the essential element of detrimental reliance.

III.   Negligent Misrepresentation Claims

To establish a claim for negligent misrepresentation, a claimant must establish: (1) an untrue statement; (2) made by one who has no reasonable ground for believing the statement was true; (3) on which the speaker intends the listener to rely; (4) and on which the listener relied; and (5) such reliance caused harm to the listener.   *Sawyer v. USAA Ins. Co.*, No. 11-0523, 2012 WL 6005766, *25 (D.N.M. Nov. 9, 2012).   "[A] promise cannot serve as the predicate for a negligent misrepresentation claim."   *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107 (10th Cir. 2009); *see*

12

*also Murray v. Xerox Corp.*, 811 F.2d 118 (2d Cir. 1987) ("Promises of future conduct are not actionable as negligent misrepresentations."); *High Country Movin', Inc. v. U.S. West Direct Co.*, 839 P.2d 469, 471 (Colo. Ct. App. 1992) (negligent misrepresentation claim "cannot be based solely on the nonperformance of a promise to do something at a future time").

As with their fraud claims, Defendants predicate their negligent misrepresentation claims on Wagner's representations regarding (1) its intentions to fix the Harvester and (2) its completion of the necessary repairs to the Harvester.   First, the law is clear that a promise cannot serve as the predicate for a negligent misrepresentation claim.   Accordingly, Wagner's promises to fix the Harvester are not actionable as negligent misrepresentations.   Further, detrimental reliance is an essential element of negligent misrepresentation.   As discussed above, in light of the undisputed evidence, Defendants cannot establish that they relied, to their harm, on Wagner's false representations regarding its completion of repairs.   Accordingly, Wagner's representations regarding completion of repairs are not actionable as negligent misrepresentations.

IV.   Constructive Fraud Claims

"In order to establish a cause of action based on a claim of constructive fraud, [a claimant] must prove a breach of a legal or equitable duty which the law declares fraudulent because of its tendency to deceive others." *Parker v. E.I. Du Pont De Nemours & Co., Inc.*, 909 P.2d 1 (N.M. Ct. App. 1995) (citation omitted).   "An action for constructive fraud is maintainable where there is a nondisclosure of material facts and the person charged with the constructive fraud had a duty to speak under existing circumstances."   *Barber's Super Markets, Inc. v. Stryker*, 500 P.2d 1304, 1309 (N.M. Ct. App. 1972).   In the absence of a fiduciary relationship between the parties, "constructive fraud is defined as acts contrary to public policy, to sound morals, to the provisions of a statute, etc., however honest the intention with which they may have been performed."

13

*Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 820 P.2d 1323, 1327 (N.M. 1991).

As with their fraud and negligent misrepresentation claims, Defendants predicate their constructive fraud claims on Wagner's representations regarding (1) its intentions to fix the Harvester and (2) its completion of the necessary repairs to the Harvester.   Defendants have failed to identify how these representations constitute a breach of a legal or equitable duty which, because of its tendency to deceive, was fraudulent.   Defendants refer only to the express and implied contractual duties arising under the Settlement Agreement; surely, an alleged breach of such duties alone would be insufficient to constitute constructive fraud.   Nor have Defendants established that, under the circumstances here, where Wagner and Defendants engaged in an arms-length business transaction, Wagner had a duty to speak.   Finally, Defendants have failed to establish that Wagner's representations were contrary to public policy, to sound morals, or to the provisions of a statute.

V.      Claims of Unfair Practices Act Violations

In order to prove a claim under the UPA, a claimant must show that the party charged engaged in actions that were "[u]nfair or deceptive trade practices . . . [or] unconscionable trade practices in the conduct of any trade or commerce."   NMSA 1978 § 57-12-3.   An "unfair or deceptive trade practice" is "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . that may, tends to, or does deceive or mislead any person."   NMSA 1978 § 57-12-2(D).   An "unconscionable trade practice" is "an act or practice in connection with the sale, lease, rental or loan, of any goods or services . . . or in connection with the offering for sale, lease, rental or loan, of any goods or services . . . which to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair

14

degree; or (2) results in a gross disparity between the value received by a person and the price paid."   NMSA 1978 § 57-12-2(E).

As with their fraud, negligent misrepresentation, and constructive fraud claims, Defendants predicate their UPA claims on Wagner's representations regarding (1) its intentions to fix the Harvester and (2) its completion of the necessary repairs to the Harvester.   Plaintiff argues that because these representations are connected to negotiation of and compliance with the Settlement Agreement, rather than the initial purchase of the Harvester, they were not "made in connection with the sale, lease, rental or loan of goods or services," and thus are not actionable under the UPA.

In support of its argument, Plaintiff cites to *Ortiz v. Collins*, in which the Texas Court of Appeals held that "[n]egotiations to settle litigation do not constitute consumer transactions [for purposes of the Texas Deceptive Trade Practices Act ("DTPA")], even when the subject of the litigation involves a good."   203 S.W.3d 414, 425 (Tex. Ct. App. 2006).   If it were otherwise, the court explained, "every lawsuit concerning a dispute over the purchase or lease of a good or service would itself constitute a consumer transaction."   *Id.*   Similarly, in *Kincaid v. Cummins Engine Co., Inc.*, the same court held that promises made in connection with a settlement agreement were not actionable under the DTPA, because "negotiating the settlement agreement was not a consumer transaction and the [plaintiffs] were not consumers."   No. 05-04-1803, 2005 WL 1744959, *1 (Tex. Ct. App. 2005).   The court explained that, while the settlement agreement contained repair services, "the agreement itself was not a good or service nor were the Kincaids looking to purchase goods or services when settling the claim."   *Id.*

The New Mexico courts have not addressed the issue of whether representations made in the course of and following settlement negotiations meet the "connection with sale of goods"

requirement of the UPA.   Admittedly, the New Mexico Court of Appeals has observed that the

provisions of the UPA "appear to be crafted so as to ensure that the UPA has a broad scope."

*Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1097 (N.M. Ct. App.), *cert. denied*, 280 P.3d

304 (N.M. 2007).   That observation, however, was made in the context of considering whether the

UPA is broad enough to "encompass misrepresentations which bear on downstream sales by and

between third parties."   *Id.*   While the court held that the UPA does not require "the plaintiff to

acquire goods or services *from* the defendant," the court nonetheless concluded that the UPA does

contemplate "a plaintiff who seeks or acquires goods or services *and* a defendant who provides

goods or services."   *Id.* at 1097-98.   Accordingly, the court concluded that, "[c]onsistent with its

purpose as consumer protection legislation, the UPA gives standing only to buyers of goods and

services."   *Hicks v. Eller*, 280 P.3d 304, 309 (N.M. Ct. App.), *cert. denied*, 294 P.3d 445 (N.M.

2012).

        Based on the New Mexico appellate court's restriction of UPA claims to cases in which the

claimant is a buyer of goods and services, this Court is persuaded that the New Mexico courts

would follow the Texas courts in determining that promises made in connection with a settlement

agreement are not actionable under the UPA, because neither party to the settlement agreement is a

buyer of goods or services when seeking to settle a claim.   Here, in entering into the Settlement

Agreement, Defendants were not seeking or acquiring goods or services.   Rather, the parties were

seeking to settle any claims they had arising out of the original purchase of the Harvester.

Accordingly, in the context of the representations at issue here, all of which were made in

connection with the Settlement Agreement and Wagner's compliance therewith, Defendants

simply were not buyers of goods or services.   Defendants thus cannot establish the "connection

with the sale of goods" element of their UPA claims.

16

**<u>CONCLUSION</u>**

Because Defendants agreed to release all claims encompassed by the Settlement

Agreement, Defendants are foreclosed from litigating their claims of negligent misrepresentation,

fraud, constructive fraud, and violation of the UPA, to the extent those claims are based on

pre-settlement misrepresentations.   For the additional reasons set forth above, Defendants' claims

of fraud, negligent misrepresentation, constructive fraud, and violations of the UPA, to the extent

those claims are based on representations made in connection with and after the Settlement

Agreement, fail as a matter of law.   Accordingly, Plaintiff is entitled to summary judgment in its

favor on Counts VII through X of the First Amended Counterclaim.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment

[Doc. 165] is granted.

DATED this 26th day of September, 2013.

MARTHA VAZQUEZ
United States District Judge

17